No. 3132

**Second Circuit**

(Second Division)

———

**SHAW v. KNIGHT ET AL.**

———

(May 7, 1931. Opinion and Decree.)
(June 11, 1931. Rehearing Refused.)

———

Barksdale, Bullock, Warren, Clark & Van Hook, of Shreveport, attorneys for plaintiff, appellee.

Harry V. Booth, of Shreveport, attorney for defendants, appellants.

TALIAFERRO, J. On June 25, 1924, plaintiff, by written act, leased to K. D. Poultry Company, composed of C. G. Knight and his wife, Kate Dambly Knight, for a period of eighteen months, beginning July 1, 1924, and for a monthly rental price of $200, six acres of his plantation, north of Bossier City, in the parish of Bossier (on which was located a poultry plant), with all improvements thereon, with some exceptions fixed in the lease.

The following are among the undertakings plaintiff, lessor, bound himself to perform:

(1) To furnish lessees three four-room cabins to be occupied by their laborers.

(2) To install, within 30 days from date of lease, a tank so situated as to furnish sufficient supply of water to chicken house, poultry plant, and dwelling house occupied by defendants, lessees, during all hours of day and night.

(3) To drain roadway from gravel road at railroad track to front door of poultry plant and cover same with sufficient coat of cinders, gravel, or rock, so that said road would be passable for automobiles, trucks, etc., in all kinds of weather, and within 60 days from date of lease.

(4) To furnish straw or hay for hen houses, plow chicken runs, etc.

The contract of lease was signed by lessor and lessees, and by J. Dambly, as guarantor for the payment of the monthly rentals.

Lessees occupied the leased premises and paid rent thereon until July 1, 1925, when, after giving plaintiff written notice many days prior of their intention to do so, they vacated the premises, moving into the city of Shreveport. This suit followed.

Plaintiff seeks to recover judgment against the lessees and their guarantor, in solido, for $1,200, with 5 per cent interest from July 1, 1925, being the amount of rent for the unexpired term of the lease contract. He also sued for $525 alleged damages to improvements on the leased land caused by lessees, but this demand was voluntarily dismissed and non-suit taken, after trial, but before judgment.

Plaintiff avers that he complied with all of the obligations assumed by him in the lease agreement; that defendants abandoned the lease without good cause, and have declined to pay the balance due thereunder.

Defendants admit they vacated the leased premises July 1, 1925, "due to plaintiff's numerous violations of his obligations under the lease agreement"; and that demand had been made on them for the rent sued for, but deny that they owe plaintiff any amount whatever. They aver that plaintiff did not discharge the agreements made by him in the contract of lease, but on the

contrary violated his covenants with defendants, in the following respects, which forced them to vacate the leased premises, viz.:

(a) That he failed to furnish the three four-room cabins for laborers.

(b) That he utterly failed to provide adequate supply of water.

(c) That he failed to build the roadway from railroad to front door of poultry plant.

(d) That he failed to furnish straw and hay for hen houses, except for about two months.

And "that they importuned plaintiff constantly to remedy these conditions, demanding him to carry out the obligations he assumed under the contract with them," and seeing that he would not do so, no other course was open to them than to vacate the leased property.

Defendants C. G. Knight and his wife reconvene against plaintiff, and state: That they were engaged in the wholesale milk-fed poultry business; that to operate such a business successfully, it is necessary to handle and dispose of poultry at certain times, which generally runs from seven to fourteen days, when the poultry is on the feed, and, if not handled promptly, it will depreciate; that to cope with these conditions, it is necessary to have regular labor on the premises; that plaintiff's failure to furnish the cabins mentioned in lease contract caused them to be without labor at critical times; that labor would be brought from the city of Shreveport, but, for lack of housing facilities to accommodate them, they would return after a day or two.

They aver that in November and December, they purchased 16,942½ pounds of turkey, which should have stood a normal shrinkage of ten per cent for killing and dressing, or 1,694 pounds, but in fact the shrinkage was 2,706 pounds in excess of that amount, which loss in weight is directly attributable to shortage of labor necessary to kill and dress the turkeys at proper times, which lack of labor was due to plaintiff's failure to provide the houses he agreed to; that said 2,706 pounds of turkey could have been sold for $0.35 per pound, or a total of $947.10; that they could have purchased 40,000 pounds additional turkey which could have been sold for $.40 per pound, at a profit of 10 cents on the pound, but for lack of houses for labor they did not make further purchases; and as a result their losses on the turkeys they handled and loss of anticipated profits on those they could have handled amounted to $4,947.10.

That, on account of insufficient water supply, they were damaged $500, for loss of time, inconvenience, and expense in carrying water to meet the requirements of their business.

That, by reason of plaintiff's failure to build cinder roadway, they were damaged $25, being amount they expended to complete the road.

That they had to purchase peet moss to amount of $50, on account of plaintiff not furnishing hay and straw provided in the contract.

They were forced to sell at a sacrifice price nineteen steel chicken cages as an incident to their moving from the leased premises, sustaining a loss of $379.30 thereon, and, finally, they claim damages to the amount of $250, for miscellaneous ex-

pense incurred by them in moving from leased premises, all by reason of plaintiff's violation of his contract with them. The total of the various elements of damage claimed is $6,151.40.

Defendant J. Dambly admits signing the lease as guarantor of the rental payments therein stipulated, and adopts the answer of his co-defendants, and the defenses by them urged, as his own.

The lower court gave plaintiff judgment for the amount sued for, and defendants judgment on their reconventional demand for $10.66, the amount expended by them for peet moss, after plaintiff failed to provide hay and straw, as agreed in the lease.

Defendants prosecute this appeal.

The record in this case is voluminous. The note of evidence covers 340 pages. The testimony is conflicting.

Defendants' counsel, in brief, restricts their claims for damages on their reconventional demand to the following items, viz.:

| | |
|---|---|
| Excess shrinkage on turkeys 2706 pounds, at 40 cents . | $ 1,042.80 |
| Loss on sale of steel chicken cages | 379.30 |
| Plumbing expense new quarters | 75.00 |
| Expense of removing | 46.50 |
| Total | $ 1,543.60 |

From this position, it is evident defendants have abandoned all other claims for loss and damages set up in their reconventional demand. This narrows the issue between plaintiff and defendants to whether plaintiff substantially complied with his obligations, under the contract of lease, with respect to furnishing the cabins for defendants' laborers and providing adequate water supply.

Plaintiff's plantation of some 3,500 acres surrounds the poultry plant and premises leased to defendants C. G. Knight and wife. To afford water to work stock, tenant houses, and other portions of the place, where needed, he has an elevated tank of about 25,000 gallons capacity, supplied with water from a deep well. This tank is filled twice daily to overflowing. Water mains connect with this tank and are laid beneath the ground. These extend over the plantation so as to conduct water for the purposes above mentioned. On the mains there are storage or reserve tanks to impound water to meet emergencies that might arise at the source of supply. The poultry plant of plaintiff, leased to defendants, is supplied with water from this system. The water system of the plant was installed according to Mr. C. G. Knight's ideas and desires. After the lease was signed, plaintiff erected an additional storage tank of 1,500 gallons capacity near to and for the use of the poultry plant. The connections with this tank were so arranged that when filled the inflow of water could be cut off, thus holding the entire tank in reserve, and at the same time water from the mains and laterals would supply the plant.

These water systems were designed by competent plumbers, and it is clearly shown that they meet the demands made upon them.

It is possibly true that at times the water supply ran low and the pipes froze, but as defendants' business only required, as a rule, some six hundred gallons daily, they could and should have guarded against such happenings, especially as to freezing. It is an experience common to all of us that water pipes will freeze during very

cold weather, if not drained, causing inconvenience and injury.

We are of the opinion plaintiff discharged his obligations with respect to the water supply to defendants.

It is contended by defendants that under the terms of the contract of lease plaintiff was obligated to erect three four-room cabins on the land affected by the lease, while plaintiff controverts this construction of the contract, taking the position that by making available on his plantation, within reasonable distance of the poultry plant, houses the equivalent of those described in the contract, was a fulfillment of contract on this score.

In construing the word "furnish," as employed in the lease agreement, it is well to consider the surrounding circumstances at the time of the signing of the contract. Prior to this date, C. G. Knight and plaintiff operated the plant. The latter was well acquainted with the surroundings. He lived on the leased premises with his wife. Plaintiff's plantation has something like 75 tenant houses on it. Many of them within one-fourth of a mile of the poultry plant premises, and at date of lease contract nearly all, if not all, of the labor employed at the plant, were living in plaintiff's houses not on the leased premises.

The evidence, though conflicting, makes it reasonably clear that there were houses within reasonable distance of the plant, available for defendants' labor at all times. Some of these were not more than seventy-five yards distant.

We agree with plaintiff's construction of the clause in the lease agreement with regard to the furnishing of houses for defendants' labor. Going a step further, even should we admit that plaintiff did not meet his obligation fully about furnishing the houses, as contemplated in the contract, it does not follow, nor is it proven, that defendants' losses, if any, directly resulted from this failure of duty. So many factors entered into this poultry sales business, affecting the question of profits or losses, that it would be practically impossible to fix responsibility for lack of success on any one of them.

Plaintiff argues that this poultry sales venture was unprofitable from the beginning, and for that reason defendants were anxious to rid themselves of it. There is much in the record to support this. Mr. C. G. Knight admits in his testimony that he lost money on all the turkeys he purchased, but ascribes his losses to the lack of houses and water. He resumed the business in Shreveport, after quitting the lease with plaintiff, but soon thereafter secured employment at a salary with a packing company.

Defendants make the point that, since plaintiff resumed possession of the leased premises, following defendants' removal therefrom, and held same during the unexpired part of the lease term, he is precluded from suing to collect the unearned rent. This question was not raised by the pleadings, and the lower court so held. However, there is some evidence on the point in the record, and it tends to show, in fact does show, that plaintiff secured a man as caretaker on the property, without compensation to himself. The lessor has the right to take possession of the abandoned leased premises in furtherance of its protection and conservation.

For the reasons herein assigned, the judgment appealed from is affirmed.